**18 MAG 8324**   ORIGINAL

Approved: _____
            CHRISTOPHER J. DIMASE / NICHOLAS FOLLY
            Assistant United States Attorneys
            JULIETA V. LOZANO
            Special Assistant United States Attorney

Before:     HONORABLE STEWART D. AARON
            United States Magistrate Judge
            Southern District of New York

- - - - - - - - - - - - - - - - x
                                 :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA         :
                                 :   Violations of 18 U.S.C.
        - v. -                   :   §§ 1951, 2, and 3238
                                 :
OLIVER HARGREAVES,               :   COUNTY OF OFFENSE:
                                 :   NEW YORK
        Defendant.               :
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   KURT HAFER, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Extortion)**

   1. From at least in or about March 2017, up to and including in or about August 2017, OLIVER HARGREAVES, the defendant, who was arrested in the Southern District of New York, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, HARGREAVES and other co-conspirators not named as defendants herein, used threats of physical harm to attempt to collect payment through international wire transfer from an individual in the United Kingdom whom HARGREAVES and his co-conspirators believed had stolen the proceeds of an international fraud

scheme, which were supposed to have been sent via international wire transfer to the United States.

(Title 18, United States Code, Sections 1951 and 3238.)

## COUNT TWO
### (Attempted Extortion)

2. From at least in or about March 2017, up to and including in or about August 2017, OLIVER HARGREAVES, the defendant, who was arrested in the Southern District of New York, unlawfully and knowingly attempted to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, HARGREAVES and others used threats of physical harm to attempt to collect payment through international wire transfer from an individual in the United Kingdom whom HARGREAVES and others believed had stolen the proceeds of an international fraud scheme, which were supposed to have been sent via international wire transfer to the United States.

(Title 18, United States Code, Sections 1951, 2, and 3238.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3. I am currently employed as a Special Agent in the Securities and Commodities Fraud Task Force at the United States Attorney's Office for the Southern District of New York, and I have been employed in this position since approximately February 2016. Prior to that date, I was employed as a Criminal Investigator at the United States Department of Energy's Office of Inspector General for approximately six and a half years. During my tenure with both offices, I have participated in numerous investigations of financial crimes and complex frauds.

4. The information contained in this affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by law enforcement officers at the Internal Revenue Service ("IRS"), the Federal Bureau of Investigation ("FBI"), and the New York County District Attorney's Office ("DANY") participating in the same investigation; (iii) information that I have obtained from international law enforcement authorities pursuant to Mutual

Legal Assistance Treaty ("MLAT") requests and other requests to foreign authorities; (iv) the review and analysis of various bank account records, including financial records obtained from international law enforcement authorities pursuant to MLAT requests and other requests to foreign authorities, conducted by myself, a paralegal I have worked with at the U.S. Attorney's Office, an IRS law enforcement agent, and officials at DANY; (v) my participation in various witness interviews; (vi) my review of e-mail evidence obtained pursuant to subpoenas, MLAT requests, and judicially authorized search warrants; (vii) open source research that I have conducted on the Internet; and (viii) my training and experience concerning the commission of financial crimes. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, moreover, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Overview

5. As described further below, during the course of a scheme to launder the proceeds of an international fraud scheme from bank accounts in China, two nationals of the United Kingdom stole over $30 million in fraudulent proceeds generated by that scheme. The primary victim of that theft—an individual located in the United States who was also involved in laundering the proceeds of the fraud scheme—retained OLIVER HARGREAVES, the defendant, to recover the stolen funds through extortion. HARGREAVES is a citizen of the United Kingdom and is believed to reside in Spain. HARGREAVES, in turn, retained a former British Royal Marine and a second individual to confront one of the United Kingdom nationals at his home in Wales to demand repayment of the stolen money using threats of violence and physical harm. The former British Royal Marine was subsequently arrested in connection with his role in the scheme by law enforcement authorities in South Wales. To date, there is no evidence that the stolen funds have been returned.

## Background on OneCoin Ltd.

6. From my participation in this investigation, I have learned that OneCoin Ltd. was founded by two individuals not named as defendants in this Complaint ("Founder-1" and

"Founder-2").[1]  OneCoin Ltd. markets a purported digital cryptocurrency called "OneCoin" through a global multi-level marketing ("MLM") network, which, in reality, is a fraudulent pyramid scheme.  OneCoin members receive commissions for recruiting others to purchase cryptocurrency packages.  This MLM structure appears to have influenced the rapid growth of the international OneCoin member network, including a significant number of members in the United States.  Records that I have obtained in the course of the investigation show that, between the fourth quarter of 2014 and the third quarter of 2016, OneCoin Ltd. generated approximately €3.4 billion in global sales revenue and earned "profits" of approximately €2.2 billion.  The records show that approximately 60% of that revenue was from OneCoin members residing in China, about 18% from Europe, 15% from Australia, and the remainder from the rest of the world; according to the records, approximately 3% percent of OneCoin Ltd.'s revenue came from investors in North America and the Caribbean.

     7.   The evidence I have gathered in the course of the investigation demonstrates that OneCoin Ltd. is a pyramid fraud scheme.  For example, in contrast to public representations that Founder-1 and Founder-2 made, and caused to be made, to investors by OneCoin Ltd., OneCoins are not "mined" by members, nor is the value of OneCoin determined by market supply and demand.  Beyond these misrepresentations, OneCoin Ltd. exhibits a variety of other features--including the fact that OneCoins have never been tradable on a public exchange--indicating that it is a fraud scheme and not a legitimate business.

     8.   OneCoin Ltd. continues to operate to this day.

### Efforts to Launder OneCoin Fraud Proceeds Out of China

     9.   Based on my review of e-mail evidence obtained pursuant to judicially authorized search warrants and my review and analysis of various bank account records, I have learned the following:

          a.   In or about January 2016, Founder-1 sought the assistance of a co-conspirator not named as a defendant in this

---

[1] I have learned that OneCoin operates using several corporate entities and d.b.a. names, to include "OnePayments Ltd.," "OneNetwork Services Ltd.," "OneAcademy," and "OneLife."  In this Complaint, I refer to these entities and d.b.a. names collectively as "OneCoin Ltd."

4

Complaint ("CC-1") to move millions of dollars of OneCoin fraud proceeds out of China. CC-1 was located in the United States and operated several businesses in the United States. In an e-mail dated January 3, 2016, Founder-1 wrote to CC-1, in part, "I need a Chinese account in CNY to move appr. 10-15M." In a responsive e-mail dated January 4, 2016, CC-1 wrote to Founder-1 in part, "We need a minimum of 2-3 accounts for the CNY . . . ."[2]

        b. By e-mail dated January 14, 2016, CC-1 provided wire instructions to Founder-1 for two bank accounts located in China (the "China Accounts"), writing about one of the two China Accounts, in part, "This is account one and it's been seasoned for 2 years~. Before transfers occur let's agree on process . . . ." Based upon my training and experience and my participation in this investigation, I believe that by "seasoned," CC-1 was referring to the fact that the account had processed legitimate business transactions in the past, making it less likely to attract law enforcement attention.

        c. Shortly thereafter, the China Accounts began receiving wire transfers from other bank accounts located in China. Subsequent e-mails between Founder-1, CC-1, and OneCoin Ltd.'s internal accountants demonstrate that millions of dollars of OneCoin proceeds were transferred into the China Accounts. The funds primarily originated from Chinese bank accounts held by: (i) Founder-2; (ii) a high level promoter of OneCoin operating in China and Hong Kong; and (iii) the office manager of OneCoin Ltd.'s Hong Kong office.

        d. E-mail evidence and bank records analysis demonstrate that between approximately January 2016 and June 2016, the China Accounts received the U.S. dollar equivalent of approximately $105 million in OneCoin proceeds.

        e. CC-1 and his associates arranged for the transfer of funds from the China Accounts to two intermediary bank accounts in China, for ultimate credit to an account held by a United Kingdom company (the "U.K. Company") at a Hong Kong foreign exchange payment processor (the "Hong Kong Account"). The U.K. Company was operated by two nationals of the United Kingdom ("U.K. National-1" and "U.K. National-2," and collectively, the "U.K. Nationals"). Upon receipt of the money from the China Accounts in the Hong Kong Account, the U.K.

---

[2] Based upon my training and experience and my participation in this investigation, I believe that "CNY" refers to Chinese Yuan currency.

Nationals were directed to transfer the funds to a U.S. bank account held by one of CC-1's associates (the "U.S. Account"). E-mail correspondence sent and received by CC-1 demonstrates that by in or about July 2016, the U.S. dollar equivalent of approximately $34 million had been transferred from the China Accounts to the Hong Kong Account, which was controlled by the U.K. Nationals.

       f.    E-mail evidence and bank records show that, in or about March 2016, the Hong Kong Account separately received the U.S. dollar equivalent of approximately $5.5 million from a bank account in Germany. That German bank account has been identified—based on evidence gathered in the course of the investigation—as an account used to receive wire transfers made by OneCoin Ltd. members for OneCoin packages.

       g.    Bank records and e-mail correspondence on which U.K. National-1 and CC-1 were copied demonstrate that between approximately March 2016 and June 2016, the U.K. Company, which was operated by the U.K. Nationals, sent approximately seven wires totaling approximately $7 million from the Hong Kong Account to the U.S. Account. The transfers passed through a correspondent bank in New York, New York.

       h.    Bank records show that between approximately March 2016 and November 2016, the U.K. Company sent a series of approximately 20 wire transfers totaling the U.S. dollar equivalent of approximately $32 million benefitting accounts controlled by the U.K. Nationals held at banks in several other Asian and European countries. This money was not directed to the U.S. Account. For this reason, and based on the additional evidence below, I believe that the U.K. Nationals intentionally re-routed these OneCoin proceeds to bank accounts that they controlled in order to steal the money.

### The Extortion Scheme

    10.   I have reviewed messages between OLIVER HARGREAVES, the defendant, and CC-1, sent between approximately March 2017 and August 2017. From my review of these messages, I have learned:

       a.    On or about March 13, 2017, HARGREAVES wrote to CC-1, in part, "I'll deal with that thing we discussed, let me know when you can speak next and we'll get it moving asap."

b. On or about March 15, 2017, HARGREAVES wrote to CC-1, "By the way in luck regarding UK issue."

c. On or about March 25, 2017, HARGREAVES wrote to CC-1, in part, "For your guys in the UK . . . I will review tomorrow, discuss Monday with a view to take ownership of it thereafter."

d. On or about March 28, 2017, CC-1 wrote to HARGREAVES, "Cumulative Outbound Transfer Activity," and attached a chart showing the transfer of the U.S. dollar equivalent of $35 million from the China Accounts to intermediary bank accounts in China for the ultimate benefit of the Hong Kong Account, controlled by the U.K. Nationals. Shortly thereafter, CC-1 wrote HARGREAVES several additional messages, stating "This is the total sent" and "33M~." HARGREAVES responded in part, "Lets chat through in 60."

e. On or about March 31, 2017, HARGREAVES wrote CC-1, in part, "We are waiting on the file on both of them, latest addresses and your [private investigator's] contact details."

f. On or about April 4, 2017, CC-1 sent several messages to HARGREAVES attaching detailed intelligence reports concerning the U.K. Nationals and other individuals and companies associated with the U.K. Nationals, including the U.K. Company. One of the reports contained photographs of U.K. National-1 and of a house believed to be U.K. National-1's residence in Wales.

g. On or about April 10, 2017, HARGREAVES wrote CC-1, in part, "leading on from our earlier chat, tangible proof of debt – bank statements showing money moving from your account to accounts controlled by the perpetrators."

h. On or about April 20, 2017, CC-1 sent HARGREAVES several messages attaching bank account statements relating to the China Accounts.

i. On or about May 17, 2017, HARGREAVES sent several messages to CC-1 attaching photographs of four different men and a message stating, in part, "do you recognize any of these people[?] These are all the males associated with the registered business address in the report and the Home address in Wales."

j.   On or about May 18, 2017, CC-1 responded to HARGREAVES, attaching a photograph of U.K. National-1 and stating, "None in above but this one I sent is [U.K. National-1] last month."

k.   On or about May 29, 2017, HARGREAVES sent a message to CC-1 stating, in part, "confirming Friday 2nd June to meet [at a location in the United States]. What is the address?"

l.   On or about June 2, 2017, CC-1 wrote to HARGREAVES stating, in part, "I appreciate your visit and look forward to greater success in the future!" HARGREAVES responded the same date stating, in part, "Its my pleasure . . . & likewise."

m.   On or about June 2, 2017, HARGREAVES sent a message to CC-1 attaching a photograph of U.K. National-2 and stating, in part, "can you confirm this is [U.K. National-2]? Tks." CC-1 responded to HARGREAVES the same day stating, "It is."

11.   I have reviewed messages sent between approximately March 2017 and June 2017 between OLIVER HARGREAVES, the defendant, and a second co-conspirator not named as a defendant in this Complaint ("CC-2"), who as described further below, was subsequently identified as a participant in the extortion scheme. Based on that review, I have learned, among other things, the following:

a.   On or about May 17, 2017, CC-2 sent several attachments to HARGREAVES and wrote, "How are ya mate? Can you ask your guy re. the debt of he recognizes any of these people." CC-2 further wrote to HARGREAVES, "These are all the males associated with the registered business address and HA in Wales." HARGREAVES responded, "Which reg business address? What does 'the HA in Wales' mean?" CC-2 replied, "Home address in Wales," and "The business address mentioned in the report you provided me with."

b.   On or about May 18, 2017, HARGREAVES wrote to CC-2, "He did not recognize any of the men in the photos. This is a photo of [U.K. National-1] from last month." CC-2 later responded, "[U.K. National-1] is clearly not at his HA. (Looks like the owner has moved back in) so any info to give us another start point on him will be helpful. Meanwhile we're checking the other guy." CC-2 further wrote to HARGREAVES, "Also mate;

8

can your guy ID second guy [i.e., U.K. National-2] if we provide images.  Or does he have an image?"  HARGREAVES responded, "I will ask," and "Ill try and get you as much as I can."

        c.   On or about June 2, 2017, CC-2 sent an attachment to HARGREAVES and wrote, "Is this [U.K. National-2]?"  HARGREAVES later responded, "Yes."

        d.   On or about June 11, 2017, CC-2 wrote to HARGREAVES, in part, "What was the last conversation . . . with [U.K. National-1] . . . and when was it?"

        e.   On or about June 12, 2017, HARGREAVES wrote to CC-2 in part, "Last meeting or communication of any kind with [U.K. National-1] was April 29, 2016 . . . ."  CC-2 responded, "Ok mate.  This is great.  Cheers."

   12.   Based on my discussions with law enforcement officials from the South Wales Police Department, and my review of materials that I have obtained from the South Wales Police Department in connection with an incident occurring on or about August 17, 2017, I have learned the following:

        a.   On or about August 21, 2017, U.K. National-1 provided a witness statement to the South Wales Police Department stating, in substance and in part, that on August 17, 2017, two men approached him at his home in Wales and demanded the repayment of $32 million that they alleged U.K. National-1 had stolen from other individuals.

        b.   Surveillance video cameras at U.K. National-1's residence captured the August 17, 2017 encounter on video.  The video, which I have reviewed, shows two men confronting U.K. National-1 in an aggressive manner in the driveway outside of U.K. National-1's residence in Wales.  One of the two men was later identified by the South Wales Police as CC-2, who is a former British Royal Marine.

        c.   Following the August 17, 2017 encounter, U.K. National-1 had his family's vehicles inspected and learned that GPS tracking devices had been installed on vehicles belonging to him, his wife, and his daughter.

        d.   Between on or about the afternoon of August 17, 2017 and on or about August 29, 2017, U.K. National-1 received threatening messages from an unfamiliar number, demanding that U.K. National-1 return the stolen $32 million.  Several of the

messages contained what appeared to be surveillance photographs taken of U.K. National-1's wife and daughter. The messages included the following:

    i.    "[U.K. National-1] I think we have some private matters to discuss about April 2016."

    ii.    "I think we need to get this matter resolved."

    iii.    "The Cny" [i.e., the funds stolen from the China Accounts].

    iv.    "I think you and [U.K. National-2] have to have a serious conversation tonight about the return of our funds."

    v.    "Our associates are in the UK to meet you at any stage to discuss the return of the stolen funds."

    vi.    "I will send you the figures that you stolen [sic] in CNY tomorrow and we would appreciate fast repayment so this doesn't get handed over to our debt recovery team which will then incur more costs and inconvenience for all parties involved."

    vii.    "This will not go away."

    viii.    An apparent surveillance photograph of U.K. National-1's daughter ("Daughter") and the Daughter's boyfriend ("Boyfriend"), along with the following caption: "[Daughter] and [Boyfriend] 29th May."

    ix.    "[U.K. National-1], we know everything about you."

    x.    "Return what you stole."

    xi.    "[U.K. National-1] that trip to MacDonald's on your way to work yesterday is really not good for your health."

    xii.    "You can not expect to steal people's hard earned funds [U.K. National-1] and sail off into the sun."

    xiii.    "Now that you and [U.K. National-2] have agreed to rtn the stolen 32M we expect a programme of repayment

no later than Thursday of this week. If this is not completed on time as agreed then matters are going to take a turn for the worse I assure you. Do what you said you're going to do and none of this will be necessary. Once this is settled you are guaranteed you will never hear from is [sic] again."

   e. On or about September 20, 2017, the South Wales Police Department arrested CC-2 in the United Kingdom. At the time of CC-2's arrest, CC-2 possessed, among other items, a cellular telephone, which contained screenshots of the above-described messages sent to U.K. National-1.

  13. I have reviewed messages between OLIVER HARGREAVES, the defendant, and CC-1, sent between on or about August 17, 2017 and on or about August 22, 2017. From my review of these messages, I have learned the following:

   a. On or about August 17, 2017, HARGREAVES sent two messages to CC-1 stating, in part, "I need to speak to you urgently regarding your uk issue," and "Call me asap."

   b. On or about August 17, 2017, an associate of CC-1 wrote to HARGREAVES, copying CC-1 and stating, in part, "not smart for anyone to be sending threatening texts to subject or allow recording of misconduct that could provide documentary evidence of a crime, if there was one."

   c. On or about August 22, 2017, CC-1 sent a message to HARGREAVES stating, in part, "Please confirm with Team that we are 'look only' as supposedly more text came today referencing [my associate]." The same day, HARGREAVES responded to CC-1, writing, in part, "Texts went out 5 hrs pre your call . . . neither you or your partners names have been mentioned in conjunction with any comms fyi." Based on my training and experience and my participation in this investigation, including my review of the messages described above in paragraph 12(d), I believe that: (i) in the first message, CC-1 was requesting that HARGREAVES and his team not further confront or threaten U.K. National-1, and instead only conduct surveillance of U.K. National-1 ("Please confirm with Team that we are 'look only'"), in light of CC-1's concern that U.K. National-1 suspected the involvement of CC-1 and his associates in the August 17, 2017 confrontation; and (ii) in response, HARGREAVES informed CC-1 that some of the threatening messages to U.K. National-1 described above were sent before CC-1 called to communicate CC-1's concerns, and that the threatening messages ("comms," i.e., communications) did not reference CC-1 or his associates.

14.  Based on the evidence described above, I believe that CC-2 works for OLIVER HARGREAVES, the defendant, and that HARGREAVES tasked CC-2 to recover the approximately $32 million in OneCoin proceeds that the U.K. Nationals were believed to have stolen from CC-1 and CC-1's associates, using extortionate means.  Based on the investigation to date, there is no evidence that the U.K. Nationals have returned the stolen funds.

15.  Based on information contained in travel records that I have obtained from the United States Department of Homeland Security ("DHS") relating to OLIVER HARGREAVES, the defendant, I have learned that HARGREAVES is a citizen of the United Kingdom, and that HARGREAVES listed on a recent travel document submitted to DHS an address in Spain as his contact address.

16.  On or about the evening of September 27, 2018, OLIVER HARGREAVES, the defendant, arrived on an international flight from Barcelona, Spain to Newark Liberty International Airport in New Jersey.  After arriving at Newark Liberty International Airport, HARGREAVES entered a vehicle, which took him from the airport to Manhattan, New York.  I and other law enforcement officials followed HARGREAVES to an area in Manhattan just outside of the Holland Tunnel, where we arrested HARGREAVES based upon the criminal conduct described herein.

WHEREFORE, the deponent prays that OLIVER HARGREAVES, the defendant, be imprisoned or bailed as the case may be.

_____
KURT HAFER
SPECIAL AGENT
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK

Sworn to before me this
28th day of September, 2018

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK